Final case for argument is 22-1730 Spine Holdings v. Orthofix Medical. Good morning. May it please the court, Miguel Hernandez for Appellant Spine Holdings. What's the foundation? I'm going to ask you about three different things. One, Lynn's sketch is describing post-filling the implant to create maximum graft. The sketches, right? What's the foundation for those? You know, like a legal foundation? Right, so the legal foundation is Lynn and Nelson. When, where, who, what, you know. Right, so April, sorry, February 2008, that's the first sketch of the drawings. Those are dated and signed. Additionally, again, we've already established the date and creators. Anna Green, Nelson's nurse, testified that she had seen those documents and they were created. Then what's the foundation for Lynn's sketches, including a bullet nose implant, an insertion tool, and a double lock screw? Same thing, Your Honor. They're signed and dated? Yes, they are signed by, or signed. The names of Russ Nelson, co-inventor, and Anna Green are listed at the top of that second sketch that you're talking about. They're signed? No, not signed by the inventors. However, Anna Green did testify under oath that she was there when the sketches were created. What's a surgery meeting? Surgery meeting is where the inventors and Anna Green, as she was Dr. Nelson's surgical nurse, they would meet before and after the surgeries and discuss, you know, the procedure. Specifically, though, during this period, the inventors were working on optimizing their implant. They had already conceived it, and now they were trying to address the shortcomings that they were seeing in the prior art, which they were performing during those surgeries. They were performing the prior art during the surgeries. Exactly, Your Honor. And so during these surgeries, they would identify deficiencies. They would discuss, how could we address this better? What could we do with our implant? Anna Green testified that this was taking place during those surgeries. We have third-party corroboration. It was during the surgeries. During those surgeries, during and after. They were discussing optimizing their implant. Are there any other foundational questions you have? So turning to the diligence, the critical period here is 20 months, which the board split into two periods, the first from February 2009 through January 2010, and the second, February 2010 to October. The board found diligence during the second period, so there's no need to address that here. The primary issue to be decided today is whether the board erred in not finding diligence during the first period. Now, Spine Holdings submitted documentary evidence and testimony establishing diligence during this period. Specifically, we have the testimony of the inventors and Anna Green, which we briefly covered during the surgeries. And notably, OrthoFix never made any effort to impeach through deposition the testimony of the inventors or Anna Green. It's uncontroverted testimony. Now, to rebut this evidence, OrthoFix relied primarily on paid expert testimony, Dr. Pelosa, that the inventors were not working on the inventions during these meetings. Those post-surgery chats that the co-inventors and the nurse wrote declarations about, as I understand it, those declarations were a tad generic. They didn't really say, oh, and on this date, we made this adjustment, so now this is how we made the knee bone connected to the leg bone different than previously. You know what I mean when I say that. Right. I see what you're getting at. And I guess the concern is why would we be able to conclude that it was unreasonable for the board to make a finding that these statements about post-surgery chats were just the descriptions of those talks were too generic and couldn't really see behind the declarations as to what, if any, kinds of progress or concrete conversations about the device actually occurred. So a few reasons, Your Honor. First, as we've already established, if it was just inventor testimony, I admit, that would be problematic. But again, we have third-party testimony corroborating it. Now, to the specifics, this happened back in 2009. We're talking a long time has passed. And I think it's important to keep in mind the context. We're not talking about a Fortune 500 company here with R&D departments and resources to document everything. We're talking about two solo inventors that were working outside their job to come up with this. So the evidence that you would find with a larger corporation, it's not there. But this court has never found a problem with this type of issue because you can forgive some of the lack of specificity over a long period of time, especially when it's two solo inventors. That's NFC technology that I'm referring to that supports this proposition. And then second— That we can forgive long gaps of time in activity between small-time co-inventors? No, Your Honor. You can forgive a lack of specificity of testimony that is talking about something that happened 15 years ago. And again, that is supported by NFC technology. So what was NFC versus here in terms of the specifics of what was offered? NFC, it was dealing with corroboration for conception. But the issue that they were having there was, again, you had an inventor testifying as to what was conceived 20 years ago. He couldn't remember the exact conversations, the specifics of what was happening. But he did testify that, yes, these elements were there during my conception. And there were some corroborating documents, circumstantial, that you can infer, okay, based on his testimony, it's reasonable that there was conception. And the board—sorry, this court also specified that, yes, based on our precedent, if we can circumstantially infer that his testimony is, in fact, reasonable, that constitutes corroboration. Turning back to the specificity, there's also another reason. We have to look at the evidence in totality. And it's important to note that in 2010, after the inventors engaged FLEX engineering, an engineer from FLEX attended surgeries with the inventors. There's documentary evidence. You can find that in Appendix 3368, that's Volume 2, Paragraph 10. Balinko Matsura, he testified that, yes, I was going to surgeries with the inventors. Additionally, there's email correspondence from Balinko. You can find that in Appendix 3321, where he's emailing the inventor asking, hey, when's the next surgery? When can I go? So, again, under the rule of reason, taking that same type of activity, which the board acknowledged is diligence, and comparing it to the surgeries with the inventors and the nurse, it's the same type. That additionally provides corroboration. Mr. Lynn's purported search for graft material as evidence of diligence, would the invention accommodate more than one type of graft material? Yes, Your Honor. There's no one type. However, it still has to perform the claimed functions. It still has to flow controllably into the implant. It still cannot just go everywhere. So there's implicit, there's some sort of fluid property, a viscosity. You can't have something to... Yes. So that is the relevance to the claimed invention and his search for graft material. So turning to an additional reason, Your Honor, back to the surgery's specificity, more circumstantial evidence is the inference you can draw from the improvements that were documented in that length August 2009 drawing. Again, we've pointed out that there's... Do we know it's dated August 2009? I don't think we know that, right? Okay, so I admit that the date is not on there. But again, you can infer based on the circumstantial evidence that it was created in August 2009. It was temporal, and there's a couple reasons. Number one, the inventors testified that, yes, we provided this document of the configuration, quote, at that time, as it existed at that time. So there's reason one why you can draw the conclusion that, yes, it was August 2009. Second, again, there's features that were added. So it took time. Again, you're inferring here, but based on circumstantial evidence, it took time to come up with these features. And I think we need to have an idea of what we're focusing on. It's not the time to actually draw it out. We're talking about the time to identify these features, come up with these features. And so that obviously took time. And so I'm not saying that those drawings alone account for the spinals or corroborate the spinal surgeries, but they add another piece of evidence. It's another data point. Is it your position that those first sketches, these kind of rough sketches dated February, April 2008, reflect the state of the invention as of February 2009? No, Your Honor. Okay. I thought at one point that there was an argument that February 2009, at that snapshot time, these little sketches represent the state of the invention. Right. Yes. That's not right. No. I misunderstood, Your Honor. We are saying that's the baseline. That's what we're starting with here, is those sketches at the beginning of the critical period. That's how the implants existed. So then there had been no progress in terms of the invention from April 2008 to February 2009? No. I respectfully disagree with that because there was other activity going in. First of all, they were still looking for the graph material that didn't start after February 2009. There's e-mails before the diligence period. And then second, I'm not going to say it's irrelevant, but there would be no abandonment issue even if there was no documented advancement because abandonment only starts when the critical period starts. So there would be no issue of abandonment even if there was no documented improvement between February 2008 and February 2009. We're in January, but I'll still let him hear. If there's no further questions, I'll reserve the rest of my time, Your Honor. Thank you. Good morning. Lisa Court. I think some of the difficulty with the discussion we just had is there's running across many dates, some inferences being drawn in the briefing to this court that weren't really presented below, and I think it would be best to focus on was there substantial evidence that supported the Board's findings of lack of diligence over the critical period as well as the reasonableness of making the combination. One of the things that was mentioned was the search for graph material. Well, the Board looked at that. First, they were curious about whether the claims actually require specific properties, but they went ahead and analyzed the corroborating evidence, and they found it just was incredible that they were searching for graph material over this whole period when the graph material described in the patent is demineralized bone matrix, DBM. And the evidence shows that Mr. Lin, one of the co-inventors, in fact, was a salesman for demineralized bone matrix, readily in his possession at any time. So there's no credibility. It wasn't corroborated. They found the evidence wasn't corroborated. They also looked to this Cabo Spine Investment Group. That was one of the stories. They said that that was to manufacture the implant. The Board looked at that evidence and said the meetings with Dr. Wieser and Timone were about their implant, a different kind of implant, and that's what the Cabo Society was doing. They were also looking to buy assets of a company that had gone bankrupt so they could sell those implants on the market and make money. There was no evidence that the Board could find that there was any discussion about manufacturing of the proposed implant. The other is the meetings after surgery. Well, apparently they're during surgery, too. Right, but are you saying that the co-inventors wanted to buy the assets of Vertebron so that it could sell Vertebron's implants? The co-inventors apparently were part of a larger group of investors. Was that in the e-mails? Yes, the e-mail chain with the bankruptcy attorney. Mr. Lannan engaged a bankruptcy attorney to try to force Vertebron into bankruptcy so they could buy their assets and they wanted to sell the Peak implants. I think the Board discussed that in their findings. Yeah, in APPX 127, no mention of manufacturing implants in APPX 131. They quoted, It makes selling the Peak interbody cages almost impossible. They were referring to the Vertebron assets. They're the ones who actually made their own Peak implants. Turning back to the meetings between Dr. Nelson, Mr. Lynn, and Anna Green in 2009, there are no specifics about what improvements were being discussed, what were made. There's no evidence to show what was done. The Board found Anna Green's testimony really didn't corroborate it. There was not a scintilla of evidence and, in fact, found more credible the testimony from Dr. Pelosa, a spine surgeon, as well as Dr. Launer, a spine holdings expert who we did depose on this issue. They said these were common practice, that the surgeons would have surgery, the sales rep would be in the operating theater, and then they would have meetings afterwards to discuss how it went as well as what their needs were for the next surgery so the sales rep could have that ready. There again, the Board found that credible. Isn't it possible, though, that given that these two were collaborating on a new kind of spinal implant, that Mr. Lynn was showing up to all these surgeries in order to see what kinds of improvements that could be made to their working model? The testimony from the other doctors is that it's just common for the sales reps to actually be in the operating room during that time period. So it's possible, but that's not the evidence that we have. I guess you're saying we just aren't sure. Maybe some of those meetings really were directed to trying to improve whatever they were trying to invent, but maybe some of the other meetings were just him trying to best learn the technology so he could sell it. It's possible, and again, it's the lack of evidence that's the trouble. I would note that the inventors testified, and the Board picked up on this, that they started working on their invention pre-critical date, right after that April 2008 meeting. They continued to work diligently towards reducing it to practice. So there must have been, if that's correct, some improvements. I don't think the drawings from April 2008 can necessarily be the state of the design in February 2009. I think that inference is not appropriate. And turning to the undated drawings, again, I think the Board was correct in not affording those. We wait to corroborate the inventor's testimony. Undated documents do not necessarily stand for the proposition that they were disclosed, just because the inventor's testimony says that. In fact, we pointed out in our brief, if you're going to speculate about the date, that just as easily it could have been created in 2008 or, more likely, January 2010. We just don't know. And it's just improper to first speculate on the date and then try to draw inferences from that of what may or may not have happened over a particular time frame. Ultimately, the Board looked at the evidence. They weighed it, the credibility. They didn't find corroborating evidence for the inventor's testimony over that 2009 time period, except for that they contacted a patent attorney to do a patentability search and found that there was a lack of reasonably continuous diligence over that time frame. Are there any questions on that? Any questions on the arguments for reasons to combine? Then I'll leave the rest of my time. Thank you. Okay, so starting with the discussion about graph material and the drawings, it's important to note that we have diligence, even if you don't find corroboration with the documents, because we have Anna Green's uncontroverted third-party testimony that corroborates their diligence during these meetings. The documents just add further support. We're not saying you have to find it alone on those documents. It's just another data point. And then concerning the graph material, again, just another data point, but the Board credited Flex's activity in researching this graph material. So, again, there's already evidence that searching for graph material was relevant to diligence, the same thing that Lynn and Nelson were doing. And, again, orthopedics can't point to anything saying that the discussions during these surgeries did not involve the inventions. It's speculative. But that requires ignoring Anna Green's uncontroverted third-party testimony. So, again, under the rule of reason, stepping back, you have to look at the entirety of the period. With the surgeries we've established from February 2009 through August, there's diligence. And then picking back up in January 2010 through October, uncontested diligence. We also have October and January. So, at worst, there's a couple of months where there's no documentation. That alone would not be sufficient to defeat diligence. If there's no further questions, I yield the rest of my time. Thank you.